# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

|                                    |                   |
|------------------------------------|-------------------|
| UNITED STATES OF AMERICA,          | CR-18-23-GF-BMM   |
| Plaintiff,                         |                   |
| vs.                                | **ORDER**         |
| BRENT DOUGLESS REEDY,              |                   |
| Defendant,                         |                   |

Defendant Brent Douglass Reedy moves the Court, pursuant to Rules 12(b)(3)(C) and 41(h), to suppress evidence obtained from a search of the car that he was driving, on the ground that the search violated his Fourth Amendment rights. (Doc. 26). The Court conducted a hearing on this matter on September 18, 2018. (Doc. 36).

## BACKGROUND

Montana Highway Patrol Trooper Smith ("Trooper Smith") observed a Dodge Charger, on December 7, 2017, at approximately 1:06 p.m., traveling north at seventy-five mph toward the Rocky Boys Indian Reservation. (Doc. 32, Ex. 1 at 1:06). Trooper Smith also observed that the car lacked visible license plates on the front or back of the car. (Doc. 32 at 2). Trooper Smith noted only an unreadable piece of paper in the car's rear window. (Doc. 32 at 2).

1

Trooper Smith initiated a traffic stop of the Dodge Charger for traveling seventy-five mph in a posted seventy mph zone. (Ex. 1 at 1:07:44). Trooper Smith approached the Dodge Charger and explained to the driver that he had stopped him for speeding and the lack of visible license plates. (Ex. 1 at 1:07:51). Upon asking where Mr. Reedy was going, Mr. Reedy began an inconsistent and strange story about who owned the car, his destination, the car's registration, and how he was going to return home. (Ex. 1 at 1:08:22).

Mr. Reedy could not produce his registration or proof of insurance for the Dodge Charger. (Ex. 1 at 1:10:58). Trooper Smith noticed what appeared to be a vehicle registration laying on the seat. (Ex. 1 at 1:10:59). Mr. Reedy claimed that the registration was for a Chevrolet Tahoe. (Ex. 1 at 1:11:00). The registration turned out to be for a GMC Yukon for someone with the last name of Sanchez-Diaz. (Ex. 1 at 1:11:01). Trooper Smith invited Mr. Reedy back to the patrol car, to which Mr. Reedy consented, so that Trooper Smith could continue to search for information on the Dodge Charger. (Ex. 1 at 1:11:28).

Once in the patrol car, and while breathing heavily, Mr. Reedy explained that he was driving from Yakima, Washington to Williston, North Dakota. (Ex. 1 at 1:12:30). Mr. Reedy claimed that he had insurance for the Dodge Charger, but he could not provide proof. (Ex. 1 at 1:12:21). Mr. Reedy explained that he was driving to a dealership in Williston where his mother-in-law allegedly had

2

purchased the Dodge Charger. (Ex. 1 at 1:12:45). Mr. Reedy further explained that the Williston dealership would return the purchase money to his mother-in-law when Mr. Reedy returned the Dodge Charger. (Ex. 1 at 1:12:59). Mr. Reedy further suggested that the Williston dealership would provide him with a plane ticket back to Yakima. (Ex. 1 at 1:13:06).

Mr. Reedy continued his story. Mr. Reedy told Trooper Smith that his mother-in-law was named Rhonda Patrick. (Ex. 1 at 1:13:38). He next explained that he had been sleeping in the Dodge Charger on the trip. (Ex. 1 at 1:15:14). Mr. Reedy suggested that his mother-in-law recently had purchased the Dodge Charger in North Dakota because her GMC Yukon had broken down while she was in North Dakota. (Ex. 1 at 1:16:00). Mr. Reedy further explained that his mother-in-law wanted to trade-in the Dodge Charger to receive money to repair the GMC Yukon that had broken down in North Dakota. (Ex. 1 at 1:16:00). Additionally, Mr. Reedy stated that, unknown to his mother-in-law at the time of purchase, the Dodger Charger previously had been in an accident that rendered it unsafe. (Ex. 1 at 1:16:04-43). Mr. Reedy further claimed that the Dodge Charger was the subject of a recall for a defective airbag. (Ex. 1 at 1:16:04-43). Mr. Reedy's story continued to shuffle these facts.

Eleven minutes into the stop, Trooper Smith had failed to locate any information using the Dodge Charger's Vehicle Identification Number ("VIN").

3

(Ex. 1 at 1:16:47). Trooper Smith continued to communicate with the Havre, Montana dispatch to seek information regarding the status of the Dodge Charger. Trooper Smith contemporaneously requested an electronic Police Information Check ("ePIC Check") on Mr. Reedy. (Ex. 1 at 1:17:46). Immediately after requesting the ePIC check, Trooper Smith returned to the Dodge Charger to see if he could recover any pertinent information from the dealer-plate inside the car. (Ex. 1 at 1:18:03). The dealer-plate and temporary registration sticker contained no license plate number.

Mr. Reedy then admitted to Trooper Smith, while waiting for information about the Dodge Charger, that his mother-in-law did not own the GMC Yukon as he previously had stated. (Ex. 1 at 1:20:10). Mr. Reedy instead explained that a person with the last name of Sanchez-Diaz owned the GMC Yukon (Ex. 1 at 1:20:12). Mr. Reedy never explained his connection, if any, to Sanchez-Diaz.

Mr. Reedy continued the story about the Dodge Charger while Trooper Smith searched the available documents for any pertinent information. Trooper Smith had obtained Mr. Reedy's criminal history by this point through his ePIC request. (Doc. 32 at 5). Mr. Reedy's criminal history report informed Trooper Smith that Mr. Reedy was the subject of a pending drug-related investigation, had previous charges and convictions for methamphetamine and marijuana, as well as

weapons charges.  (Doc. 32 at 5).  Trooper Smith then asked Mr. Reedy if he had ever been stopped by the police, if he had ever been on probation or parole, or had any previous convictions.  (Ex. 1. at 1:25:15).  Mr. Reedy denied that he had previous convictions and stated that he only had been pulled over "years before." (Ex. 1. at 1:25:15).

Trooper Smith indicated to Mr. Reedy that he would issue a warning for the lack of insurance and that Mr. Reedy needed to correct the registration information on the Dodge Charger.  (Ex. 1. at 1:26:31).  Trooper Smith then stated, "as far as the traffic stop, that stuff is done."  (Ex. 1 at 1:26:55).  Trooper Smith immediately asked Mr. Reedy if he understood what was said, and asked Mr. Reedy if he was "good to go?"  Mr. Reedy nodded an affirmative "yes."  (Ex. 1. at 1:27:00).

Mr. Reedy opened the car door, but stopped when Trooper Smith stated, "so I'd like to ask you some more stuff here, is there anything illegal in the car today?" Mr. Reedy replied no.  (Ex. 1 at 1:27:01).  Trooper Smith then asked, "any marijuana in the car? Any heroin? Any methamphetamine in the car?"  Mr. Reedy responded "no" to each question. (Ex. 1. at 1:27:00-16).  Trooper Smith repeatedly asked if he could search the Dodge Charger.  Mr. Reedy declined.  Trooper Smith called in the K-9 Unit from the Border Patrol.  (Ex. 1. at 1:27:58).

Trooper Smith explained to Mr. Reedy that he works criminal drug interdiction on a regular basis and that Mr. Reedy's story concerned him.  Trooper

5

Smith explained that the lack of information on the Dodge Charger and Mr. Reedy's denial of his previous drug charges and convictions seemed suspicious. (Ex. 1. at 1:28:20-1:30:27). Six minutes later, information from the Dodge Charger's VIN showed that the car last had been registered in California. (Ex. 1 at 1:36:21). Nothing in the record indicates the identity of the last registered owner of the Dodge Charger or any relevance that the last registered owner might have to Mr. Reedy's circumstances.

The dog arrived thirty-two minutes into the traffic stop and yielded a positive sniff. (Ex. 1. at 1:39:30-45:05). Trooper Smith impounded the Dodge Charger. (Doc. 32 at 7). Law enforcement recovered a piece of paper with an address to Poplar Montana, and two bags of methamphetamine—totaling 692.9 grams—located in the spare tire of the car. (Doc. 32 at 7).

## LEGAL STANDARD

"The ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). A fact-specific reasonableness inquiry proves appropriate for Fourth Amendment questions. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The Court evaluates the totality of the circumstances in making a reasonable-suspicion determination. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The totality of the circumstances may include, "objective observations, information from police reports . . . and consideration of

modes or patterns of operation of certain kinds of law breakers." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). Together, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274.

Traffic stops qualify as seizures under the Fourth Amendment. These temporary seizures prove reasonable where law enforcement officers possess probable cause that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Even when lawful, traffic stops violate the Fourth Amendment if executed in a manner inconsistent with the protections of the Constitution. *Illinois v. Cabelles*, 543 U.S. 405, 407 (2005).

Like a *Terry* stop, the mission of the stop determines the duration of police inquiries in the traffic stop context. This "mission" includes the time required to address the traffic violation that warranted the stop and to attend to safety related concerns. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Typically, "such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615; *see also Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979). An officer may conduct unrelated checks during an

otherwise lawful traffic stop as long as these unrelated checks do not prolong the stop *absent reasonable suspicion*. *Rodriguez*, 135 S. Ct. at 1615.

A traffic stop ends when the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. Tasks not related to "the traffic mission, such as dog sniffs, are therefore unlawful if they add time to the stop, and are not otherwise supported by independent reasonable suspicion." *U.S. v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015). A traffic stop may be extended when an officer possesses new grounds to support particularized suspicion of criminal activity. *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th Cir. 2011); *see also Reid v. Georgia*, 448 U.S. 438, 440 (1980).

## DISCUSSION

The Supreme Court determined in *Rodriguez* that police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 135 S.Ct. at 1614. A stop may not last longer than necessary to effectuate the purpose of the stop. *Id.* Authority for a seizure ends when the officer completes the tasks tied to the infraction "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

Comparable cases support the suppression of evidence under these circumstances. *Evans*, 786 F.3d at 785. The officer in *Evans* unlawfully prolonged a traffic stop when he requested an ex-felon registration check after the

8

driver had returned clean records for the car and a driver's license. *Id.* Similarly, the officer in *United States v. Rodriguez-Escalera*, 884 F.3d 661 (7th Cir. 2018), unlawfully prolonged a traffic stop when the driver promptly provided her license, registration, and proof of insurance to the officer.

Mr. Reedy argues that his case resembles *Rodriguez-Escalera*. This argument fails. The officer in *Rodriguez-Escalera* obtained all necessary information to complete the mission of the traffic stop within eleven minutes. *Id.* at 664. The officer nevertheless continued "chatting" with the driver "as [the officer] listened to his police radio waiting for [a] K-9 unit to become available." *Id.* at 665. The officer wrongfully prolonged the traffic stop by writing the traffic ticket only after confirming the availability of the K-9 unit twenty-two minutes into stop. *Id.* at 672. Trooper Smith, by contrast, found no information on the Dodge Charger's registration until after he had requested the K-9 unit. (Ex. 1. at 1:27:58-36:21). Only after he had called for the K-9 unit did Trooper Smith learn that the Dodge Charger last had been registered to an unknown owner in California.

An officer may prolong a traffic stop if circumstances give rise to reasonable suspicion that criminal activity is taking place. *United States v. Mendez,* 476 F.3d 1077, 1080 (9th Cir. 2007). Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable

9

inferences, form a basis for *particularized* suspicion." *United States v. Montero–Camargo,* 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). The Ninth Circuit deems a prolonged traffic stop reasonable if a situation "evolves" and "new particularized factors" support the additional investigation. *U.S. v. Rogers*, 656 F.3d 1023 (9th Cir. 2011). Similar to Trooper Smith, the officer in *Rodgers* obtained "bits and pieces" of suspicious information over time that required additional investigation. *Id.* at 1027. The Ninth Circuit affirmed a prolonged stop in *U.S. v. Turvin*, 517 F.3d 1097, 1102 (2008), based on facts learned and observations made after the officer had stopped the car.

Trooper Smith asked Mr. Reedy where he was going and for all the required documentation for the Dodge Charger. Mr. Reedy failed to give a direct answer as to the owner of the Dodge Charger and where the car was going. Mr. Reedy failed to provide both proof of insurance and a valid registration for the Dodge Charger. Mr. Reedy continued to contrive an explanation for the ownership of the Dodge Charger and its destination while in the patrol car. Trooper Smith's continued attempts to find information using the Dodge Charger's VIN failed. Mr. Reedy lied to Trooper Smith about his criminal history. Mr. Reedy's ePIC report included information of an active investigation and past methamphetamine charges against Mr. Reedy.

Mr. Reedy argues, however, that Trooper Smith failed to act diligently to complete the traffic stop. (Doc. 62-2). Mr. Reedy claims that the duration and scope of the stop must be carefully limited to its underlying justification. Mr. Reedy argues that the scope of the stop may not exceed what is reasonably necessary to confirm or dispel the predicate suspicion for the stop—in this case the speeding. (Doc. 26-2 at 4-5; *citing Rodriguez* 135 S.Ct. at 1614).

Mr. Reedy correctly notes that the "mission" of the stop determines the tolerable duration of a traffic stop. Mr. Reedy applies this duration as the time to address the alleged traffic violation. *Rodriguez* 135 S.Ct. at 1614. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615; *see Prouse*, 440 U.S. at 658-660. These checks serve to "ensur[e] that vehicles on the road are operated safely and responsibly." *Rodriguez* 135 S.Ct. at 1615.

Attempting to verify the Dodge Charger's registration is what Trooper Smith continued to do. Trooper Smith struggled to determine the ownership of the Dodge Charger as Mr. Reedy's story evolved. Mr. Reedy provided untruthful statements about the extent of his past involvement with the criminal justice system. At no point did Trooper Smith delay or prolong his search for the proper registration and proof of insurance of the Dodge Charger. Despite Trooper Smith's

11

diligent search, the lack of available information about the Dodge Charger itself prolonged the traffic stop. This situation stands in stark contrast to the clean records provided in *Evans*, 786 F.3d at 785, and the timely records provided in *Rodriguz-Escalera*, 884 F.3d at 664.

The particularized factors of this case evolved throughout the duration of Trooper Smith's diligent search for the Dodge Charger's registration and insurance information. After careful consideration, weighing the specific facts and evidence provided heavily, the Court finds that the totality of the circumstances furnished Trooper Smith with a reasonable suspicion that criminal activity was taking place. *Montero–Camargo,* 208 F.3d at 1129.

## **ORDER**

Accordingly, IT IS ORDERED that DEFENDANT'S motion to suppress evidence obtained from a search of the car (Doc. 26) is DENIED.

DATED this 2nd day of October, 2018.

*[signature: Brian Morris]*

Brian Morris
United States District Court Judge